UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KELLY ROME-BIENEMY AND NICOLE                     CIVIL ACTION
RILEY

VERSUS                                            NO: 14-1020

CHILDREN'S HOSPITAL                               SECTION: "A" (2)

**ORDER AND REASONS**

The following dispositive motions are before the Court: **Motion for Summary**

**Judgment Regarding the Claims of Plaintiff Kelly Rome-Bienemy (Rec. Doc. 44)**, and

**Motion for Summary Judgment Regarding the Claims of Plaintiff Nicole Riley (Rec.**

**Doc. 45)** filed by defendant Children's Hospital, Inc. Both motions are opposed. In orders

dated August 24, 2015 and September 9, 2015, the Court cancelled the jury trial scheduled

to commence on September 14, 2015, pending the ruling on the foregoing motions. (Rec.

Docs. 80 & 88). For the reasons that follow, the motion against Rome is GRANTED, and the

motion against Riley is GRANTED. [1]

    I.    **Background**

Plaintiffs Kelly Rome-Bienemy ("Rome") and Nicole Riley ("Riley") bring this action

against their former employer, Children's Hospital, Inc. ("Children's"), alleging race

discrimination (hostile work environment), retaliation, defamation, and intentional infliction of

---

[1] The parties have also filed numerous motions in limine (Rec. Docs. 43, 55, 77, 78), and
Children's has filed a motion for sanctions (Rec. Doc. 56). Two of the motions relate to unlawful
recordings of Children's hospital employees in the workplace, and Plaintiffs alleged involvement
in making those recordings. The implications of those recordings are addressed later in this
opinion.

emotional distress. Children's provides pediatric medical services and is located in New Orleans, Louisiana. Plaintiffs are African-American and worked for Children's as medical secretaries. Both plaintiffs were terminated from their employment on May 26, 2014.

Children's now moves for summary judgment on all of Plaintiffs' claims. The various causes of action and the evidence of record pertaining to them, as well as the parties' respective arguments with respect to each cause of action, are discussed in greater detail below.

### II.    Discussion

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097

(5th Cir. 1993)).

When faced with a well-supported motion for summary judgment, Rule 56 places the burden on the non-movant to designate the specific facts in the record that create genuine issues precluding summary judgment. *Jones .v Sheehan, Young, & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). The district court has no duty to survey the entire record in search of evidence to support a non-movant's position.[2] *Id.* (citing *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1992); *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir. 1988)).

### Kelly Rome-Bienemy's Claims

Rome was employed as a medical secretary in the orthopedics department at Children's from September 17, 2012, until her termination on May 26, 2014. Rome contends that she was subjected to a hostile work environment based on her race, discharged in retaliation for complaining of discrimination, subjected to intentional infliction of emotional distress, and slandered by Children's in its response to her application for unemployment benefits. Children's moves for summary judgment dismissing all of Rome's claims. Children's submits that no genuine issue exists as to any material fact entitling Children's to judgment as a matter of law.

---

[2] The Court stresses this last point because Plaintiffs jointly submitted nearly 600 pages of exhibits in opposition to Defendant's summary judgment motions. The binder that Plaintiff's counsel provided to the Court in response to its hard-copy order (Rec. Doc. 79) is remarkably well-assembled given the number of exhibits. But Plaintiffs' arguments in opposition do not refer to or incorporate all of the exhibits, and many of them constitute patently inadmissible hearsay that are not helpful. The Court considers any arguments based on exhibits that were not expressly referred to in briefing as waived, and the Court will not entertain motions for reconsideration based on any exhibits whose significance the Court might have overlooked while reviewing Plaintiffs' voluminous submission.

1.      **Retaliatory Discharge**

Children's fired Rome on May 26, 2014, which was shortly after Rome and Riley

jointly filed the instant lawsuit on May 3, 2014. Rome moved to amend her complaint on

February 2, 2015, to include *inter alia* a claim of retaliatory discharge. In her amended

complaint, Rome avers that Children's terminated her in retaliation for "protected activities:

filing prior EEOC charges and making verbal complaints of race discrimination to

management . . . ." (Rec. Doc. 30, First Amend. Comp ¶ 18(a)). No other acts of retaliation

are alleged. Children's contends that Rome was terminated for legitimate business reasons

and that her complaints of racial discrimination played no part in the decision. Children's

argues that Rome cannot establish but for causation or pretext under the applicable Title VII

standards.

Title VII's anti-retaliation provision states in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate
> against any of his employees . . . because he has opposed any practice made
> an unlawful employment practice by this subchapter, or because he has made
> a charge, testified, assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

42 U.S.C.A. § 2000e-3(a) (West 2012).

Title VII claims of unlawful retaliation based on circumstantial evidence are analyzed

under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792 (1973).[3] *Vargas v. McHugh*, No. 15-50544, — Fed. Appx. —, 2015 WL 6774016,

*3 (5th Cir. Nov. 3, 2015) (per curiam). First the plaintiff must establish a prima facie case of

---

[3]  In her supplemental memorandum Rome acknowledges that her retaliation claim is based on
circumstantial evidence. (Rec. Doc. 63, Supp. Oppo. at 4). Direct evidence would be evidence,
which if believed, proves the fact without inference or presumption. *Vargas*, 2015 WL 6774016,
at n.2 (quoting *Jones v. Robinson Prop. Grp., LP*, 427 F.3d 987, 992 (5th Cir. 2005)). Rome
does not have direct evidence of retaliation, which is common in Title VII cases.

retaliation by showing that 1) she participated in an activity protected under the statute; 2) her employer took an adverse employment action against her; and 3) a causal connection exists between the protected activity and the adverse action. *Feist v. La. Dep't of Justice*, 730 F.3d 450, 454 (5th Cir. 2013) (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007)). If the plaintiff makes a prima facie showing of retaliation, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision. *Id.* (quoting *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007)). Finally, the burden shifts back to the plaintiff to prove that the employer's proffered reasons are a pretext for retaliation. *Id.* The employee meets this burden by showing that the adverse action would not have occurred "but for" the employer's retaliatory motive. *Id.* (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013)).

The Supreme Court's *Nassar* decision clarifies that a plaintiff asserting a Title VII retaliation claim must meet a higher standard of causation than a plaintiff claiming Title VII discrimination. *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015) (quoting *Nassar*, 133 S. Ct. at 2534). Thus, mere proof that retaliation was a "motivating factor" for an adverse employment action will not suffice. Rather, the plaintiff must establish that her protected activity was a "but for" cause of the alleged adverse action by the employer. *Id.* In order to avoid summary judgment, the plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity. *Feist*, 730 F.3d at 454 (quoting *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996)).

The first step in the analysis is Rome's prima facie case of retaliatory discharge. On February 7, 2013, Rome met with Doug Mittelstaedt, the Vice President of Human

Resources, to complain about co-worker Gretchen Dondis's conduct.[4] (Rec. Doc. 44-1, Def. Mat. Fact #11). According to her original complaint, Rome filed an EEOC charge on December 13, 2013, pertaining to race discrimination. (Rec. Doc. 1, Comp. ¶ 2). The instant lawsuit was filed on May 3, 2014. Clearly, Rome engaged in protected activities at various times.[5]

Children's fired Rome on May 26, 2014. The termination letter states that Rome was fired based on *inter alia* a "recent investigation of the audio recording of Hospital staff." (Rec. Doc. 44-5 Exh. F-5, Mittelstaedt letter). Rome clearly suffered an adverse employment action. Therefore, the first two steps in Rome's prima facie case for retaliatory discharge are satisfied.[6]

Next, Rome must establish a causal connection between the protected activity and her termination. Rome's entire causation analysis is premised on the theory of temporal

---

[4] In her opposition Rome purports to "dispute" most of Defendant's Material Facts, including Material Fact #11, without explanation. (Rec. Doc. 63-1, Rome's Disp. Fact #2). As Children's points out in its reply, this is not an acceptable mechanism for controverting Children's' submission. (Rec. Doc. 73, Reply at 1).

[5] The February 7, 2013 meeting with Mittelstaedt is not Title VII protected activity because the workplace hostility that Rome was complaining about was not racially motivated. Rome went to Mittelstaedt to complain about ordinary workplace tensions between herself and coworker Gretchen Dondis. At first Rome considered Dondis's criticism of President Obama to be racial in nature because he is black but Rome conceded upon further reflection that the criticism was not race-related. There is no dispute regarding what took place during this meeting with Mittelstaedt because Rome covertly recorded it and Children's later discovered the recording on her work computer. (Rec. Doc. 44-6, Mittelstaedt decl. ¶ 5 & manual CD attachment).

[6] In her opposition Rome alludes to other discipline that she received after she filed her first EEOC complaint. (Rec. Doc. 63, Rome Oppo. at 3). The only claim for retaliation that Rome pleaded in her amended complaint was retaliatory discharge. Rome confirms in her opposition that "[i]t was not until the filing of the lawsuit that [Children's] started taking adverse employment actions" against her. (*Id.* at 2). Therefore, the Court restricts its "retaliation" analysis to retaliatory discharge.

proximity, *i.e.*, that the federal lawsuit was filed on May 3, 2014, Children's terminated her shortly thereafter on May 26, 2014, and that the closeness in time of these two events implies a cause and effect relationship. To establish a prima facie case, the plaintiff may rely on temporal proximity between protected activity and an adverse employment action only if the two are "very close" in time. *Zamora*, 798 F.3d at 335 (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). Sufficiency of "closeness" is not governed by bright line rules because a time span that suffices in a case with other circumstantial evidence of retaliation may not suffice when the plaintiff has no other evidence of retaliation. *See Feist*, 730 F.3d at 454-55 (citing *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002)). Courts in this circuit weigh temporal proximity as part of "the entire calculation" of whether the employee has shown a causal connection between the protected activity and the adverse employment action. *Hague v. Univ. of Tex. Health Science Ctr.*, 560 Fed. Appx. 328, 334 n.7 (5th Cir. 2014) (unpublished) (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992)).

Rome's argument regarding temporal proximity is that Children's knew about the taped recordings in February 2014, yet the first disciplinary act pertaining to the recordings (administrative leave without pay preceding termination), came on May 16, 2014, which was 13 days after she filed suit. Then a little more than a week later she was terminated. Rome suggests that a clear inference of retaliation can be drawn from this "very close" timeline.[7]

---

[7] Mittelstaedt is the supervisor who fired Rome. Plaintiffs have never attempted to posit that anyone else at Children's was the decision-maker on the termination decision. Obviously, the fact that a lawsuit is filed does not *ipso facto* mean that the decision-maker knew about it when he acted. The Court assumes that Mittelstaedt is not Children's registered agent for service of process. To establish the causation prong of a retaliation claim the employee should demonstrate that the decision-maker knew about the employee's protected activity. *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 883 (5th Cir. 2003) (citing *Medina v. Ramsey Steel Co.*, 238

The filing of the lawsuit and the termination were "very close" in time. As to Plaintiffs' suggestion that Children's knew about the audio recordings in February 2014, Children's engaged Avansic, Inc. to examine Rome's computer drive for recordings in February 2014. The Court has been unable to discern from the record, including from the parties' briefing on the motion in limine pertaining to Avansic's expert report (Rec. Docs. 43 & 53), exactly when Avansic found a file entitled "Happy Audios" on Rome's computer and provided it to Children's. The Happy Audios file is significant because it contained definitive proof that Rome had not only been recording conversations with other staff in violation of the hospital's policy but also that she had lied to management on several occasions. Mittelstaedt did state in his declaration that it took him several weekends to review about 40 hours of recordings, and it was after doing so that he knew definitively that Rome had been lying to him. (Rec. Doc. 44-5 Exh. F, Mittelstaedt decl. ¶¶ 33, 43). On May 16, 2014, Mittelstaedt attempted to question Rome about the recordings but she refused to cooperate. (*Id.* ¶ 44). The Court accepts Rome's prima facie case based on temporal proximity.[8]

---

F.3d 674, 684 (5th Cir. 2001)). After all, "[i]f an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct." *Chaney v. New Orleans Pub. Fac. Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999).

      The court record does not contain a return of service document so the Court has no information about when Children's was actually served with the lawsuit or who accepted service for Children's, much less when Mittelstaedt actually learned about it. Counsel for Children's did move for an extension of time to answer on May 28, 2014 (Rec. Doc. 4), so someone at Children's was served with Plaintiffs' complaint at some point before that date. The Court will give Rome the benefit of the doubt on this point.

[8] The Fifth Circuit has not held that temporal proximity *alone* suffices for causation. *See Zamora*, 798 F.3d at 335. And in the aftermath of the Supreme Court's *Nassar* decision, which increased the requisite nexus between the supervisor's action and the adverse employment action, the Court surmises that the cases, if any, where temporal proximity alone will suffice are going to be few and far between. Courts have taken differing positions on how *Nassar* affects the prima facie analysis in Title VII retaliation cases. *Compare Foster v. Univ. of Maryland*, 787

The next step of the *McDonnell Douglas* framework falls to Children's to produce its legitimate, non-discriminatory reason for terminating Rome. According to Mittelstaedt's letter, Rome was terminated based on the recent investigation of the audio recordings of hospital staff. (Rec. Doc. 44-2 Exh. F-5, Mittelstaedt letter). Mittelstaedt explains that recordings were found on Rome's computer even though she had denied earlier in the year that her only copies of the recordings were stolen. Mittelstaedt had asked Rome for copies of the recordings that she gave to the EEOC so that he could review them. Mittelstaedt also cites to Rome's recordings of conversations that she had with him, and other Children's personnel which was done in violation of the hospital's policies. Mittelstaedt points out that Rome had lied to him about making the recordings, and that one of the recordings actually exposed a false statement that Rome had made about a February 7, 2013 meeting with Mittelstaedt. (*Id.*). Rome had accused Mittelstaedt of denying that the term "monkey" was racist at that meeting. As it turns out, this never came up at all during the meeting.

In addition to the times that Rome covertly recorded her own conversations with hospital staff in violation of hospital policy, and then lied about it to management, this case also involves non-consensual recordings of other coworkers' private conversations where Rome was not a participant. These recordings have serious implications because Louisiana law makes it unlawful to intercept any oral communication unless the person acting is a

---

F.3d 243 (2015) *with Donald v. UAB Hosp. Mgmt., LLC*, No. 14-727, 2015 WL 3952307 (N.D. Ala. June 29, 2015). The Court is not overly concerned with these legal issues because regardless of how stringently or deferentially the Court judges Rome's prima facie case, the Court is persuaded that she cannot defeat summary judgment as to pretext and that she cannot establish "but for" causation. The Court's inclination was to bypass the prima facie analysis and proceed directly to the issue of pretext but last year in the unpublished *Hague v. University of Texas Health Science Center* decision cited above, two circuit judges on the panel concluded that the district judge erred in proceeding in that manner.

party to the communication or where one of the participants consents. La. R.S. §§ 15:1303(A)(1), (C)(4). It is undisputed that the participants did not consent because Mittelstaedt followed up with them to confirm this. Rome denied (and continues to deny) any knowledge regarding who made those illegal recordings, but Mittelstaedt questioned the veracity of her denial when the Happy Audios file was found on her computer. He expressly mentions this as one of the grounds for Rome's termination. (*Id.*).

Children's has produced several legitimate, non-discriminatory reasons for the decision to terminate Rome. The burden now shifts to Rome to prove that Children's' proffered reasons are a pretext for retaliation. Rome must rebut each non-retaliatory reason articulated by Children's. *McCoy*, 492 F.2d at 557 (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). To meet this burden Rome must show that Children's would not have fired her "but for" her having filed the instant lawsuit. The Court is persuaded that Rome has not created an issue of fact as to either pretext or causation.

It is undisputed that Children's had an express policy prohibiting employees from recording other employees without their "specific permission." (Rec. Doc. 44-5 Exh. F-6, Children's Hosp. Operating Polices/Procedures). Rome violated this policy on more than one occasion (Rec. Doc. 44-2 Exh. C, Rome depo at 18), and then lied to Mittelstaedt about it. (*Id.* at 80-81). The Court has listened to the audio of the meeting between Mittelstaedt and Rome that took place on February 7, 2013. This recording, which was not discovered until Avansic found the Happy Audios file on Rome's computer, is significant because it reveals that Rome was lying when she later accused Mittelstaedt of making racially inappropriate comments during the meeting. The Court also listened to a recording of a meeting between Mittelstaedt, Rome, and another staff member on January 24, 2014. This

recording is significant for two reasons. First, when during that meeting Mittelstaedt confronted Rome about her misrepresentation regarding his comments at the February 7, 2013 meeting, she vociferously disagreed with him and maintained that her characterization of the meeting was the correct one. Rome knew this was untrue because unbeknownst to anyone else, she had recorded the meeting so she knew exactly what had been discussed. Second, Mittelstaedt prefaced his remarks at the January 24, 2014 meeting with a warning that the meeting was part of an official investigation regarding other audio files that had surfaced, and that lying to him would be grounds for discharge. At the conclusion of that meeting, Mittelstaedt asked Rome if she was recording that meeting and she told him "no." This of course was another lie.

The termination letter also explains that Mittelstaedt believed that Rome was involved in making the recordings that appeared to violate Louisiana law, and that she had been dishonest about her involvement in them.

According to Mittelstaedt, on January 6, 2014, Dr. Stephen Heinrich, who was one of the physicians in Rome's department, gave him a recording of a conversation between two other medical secretaries, Dorothy Phillips and Judy Gab. (Rec. Doc. 44-5, Mittelstaedt decl. ¶ 20). Mittelstaedt confirmed that the recording had been made while the two women were talking privately in an office and that neither had consented to the recording or was aware that a recorder was capturing their conversation. Mittelstaedt questioned Rome about the recording but she denied any involvement. At this point, Children's did not know about any of the recordings that Rome had made.

Then, in conjunction with an unrelated disciplinary write-up, Rome authored a rebuttal narrative that made express references to statements that Phillips had made on an

audiotape recording, and to other recordings that were given to the EEOC in support of Rome's complaints. (Rec. Doc. 44-5 Exh. F-4, Rome rebuttal). Mittelstaedt attests that he met with Rome on January 27, 2014 about the recordings, and that she denied any knowledge of who made the recordings. Rome claimed to have simply found them on her desk.[9] (Rec. Doc. 44-5 Exh. F, Mittelstaedt decl. ¶¶ 27-28). Mittelstaedt says that he asked Rome for copies of the recordings so that he could review them but on February 5, 2014, but she claimed that someone had stolen her copy of the recordings and that she had no other copy. (*Id.* at ¶ 30).

Apparently Mittelstaedt did not believe Rome because in February 2014 Children's hired Avansic, Inc., a digital forensic company, to examine Rome's work computer. Avansic found the "Happy Audios" file on Rome's computer and it contained approximately 40 hours of audio recordings. The recordings were definitive proof that Rome had violated hospital policy when she recorded meetings with Mittelstaedt and other staff, and that she had lied specifically about recording the meeting in January 2014. It is the Court's understanding that most of the recordings in the Happy Audios file were non-consensually-recorded employee conversations of which Rome was not a participant. (*Id.* ¶ 38). These recording were not provided to the Court.

In her opposition, Rome cites to the fact that she not truthful about her actions until she was deposed under oath in June 2015—in other words, that Children's did not have actual proof of her deceit until *after* she was fired when she finally confessed under oath. Rome continues to deny that she played any role in making the non-consensual employee recordings—recordings that were presumably helpful to Rome's position on the EEOC

---

[9]   The Court has listened to this recording. Mittelstaedt's characterization is accurate.

charge since she gave them to the EEOC before anyone at Children's had the opportunity to hear them. Rome relies upon the fact that there is no *direct* evidence that she made the unlawful recordings that were found on her computer. And Rome has denied any knowledge of how the Happy Audios file came to be located on her computer, which is an interesting denial because the file included the meetings that Rome now admits to recording. Mittelstaedt, on the other hand, viewed the Happy Audio's file on Rome's computer as strong circumstantial evidence of her involvement in the illicit recordings and in her lack of truthfulness about the matter. (Rec. Doc. 44-5 Exh. F-5, Mittelstaedt letter).

Rome's contentions are meritless but not because Mittelstaedt's contentions in the May 26, 2014 termination letter about Rome's improper recordings in violation of hospital policy and untruthfulness were actually correct in hindsight. Children's did not need *actual* proof of anything in order to terminate Rome, although the recordings of the meetings that she covertly recorded were actual proof that she violated hospital policy. And when Avansic found the recordings they were actual proof of her untruthfulness. That she now claims to have known nothing about the hospital's policy against making those recordings is of no moment because Title VII does not impose a "fairness" requirement in termination decisions. And even if Rome was unaware of the hospital's policy against making recordings, she was untruthful about it when confronted. She can hardly claim a benefit from that untruthfulness by pointing out that she only came clean once she was deposed in this lawsuit. The issue with respect to pretext is not whether Mittelstaedt's belief was based on probable cause, or even whether it was correct because even an erroneous belief can constitute a legitimate, nondiscriminatory justification for an adverse action. *See Mayberry v. Vought Aircraft Co.*, 555 F.3d 1086, 1091 (5th Cir. 1995). Rome creates no issue of fact

as to pretext.

Simply, Rome fails to recognize that she was an at-will employee who could be fired for *any* reason except for one that violated Title VII. The burden is not on Children's to prove that it fired Rome for non-discriminatory reasons but rather on Rome to prove that "but for" her filing of this lawsuit Children's would not have fired her. In light of her own abhorrent conduct Rome cannot establish but for causation. The best that Rome could ever hope to prove is that retaliation had been a motivating factor in the otherwise well-supported decision to terminate her, but post *Nassar* that would not be enough to meet her burden of proof. Children's is entitled to judgment as matter of law on Rome's retaliatory discharge claim.

### 2.      Race Discrimination: Hostile Work Environment

Children's moves for summary judgment on Rome's race-based hostile work environment claim. Children's argues that the acts of harassment alleged by Rome do not give rise to a hostile work environment claim, and that she cannot prove that any alleged acts affected a term, condition, or privilege of employment.

To establish a claim of hostile work environment under Title VII a plaintiff must prove that she 1) belongs to a protected group; 2) was subjected to unwelcome harassment; 3) the harassment complained of was based on race; 4) the harassment complained of affected a term, condition, or privilege of employment; 5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). Harassment affects a "term, condition, or privilege of employment" if it is "sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Id.* Workplace conduct is not measured in isolation. *Id.* In order to deem a work environment sufficiently hostile so as to support a claim under Title VII, "all of the circumstances must be taken into consideration." *Id.* This includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* To be actionable, the work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)).

At the outset, it is important to remain mindful that Title VII does not purport to legislate personal beliefs. Therefore, evidence of coworker "racism" that Rome obtained by searching social media is not relevant to her workplace claim.[10] And evidence of private conversations that Rome would not have heard but for her decision to listen to audio recordings that someone most likely obtained in violation of the law is also not evidence of workplace harassment. The Court's analysis will only involve the instances of workplace race-based conduct that Rome was exposed to as a "condition" of her employment and that she can testify to first-hand.

Considering how diligent Rome was about recording meetings and documenting the

---

[10] The social media evidence is not even objectively race-based. For instance, Rome was questioned at her deposition regarding a Facebook post by Pam O'Flynn that Rome searched for and found online. The post said, "I just want a president who loves America." (Rec. Doc. 44-2, Rome depo at 143). Apparently the context of the post made clear that it was complimentary of President Reagan, and therefore implicitly critical of President Obama. When asked whether O'Flynn's regard for President Reagan meant that she was a racist, Rome answered "yes." (*Id.* at 145).

goings on at the office, her reports of racial slurs as recounted in her deposition are somewhat amorphous, imprecise, and hard to follow. For instance, Rome asserts that "the comment in our office was that President Obama was referred to as a monkey or was called a monkey."[11]  (Rec. Doc. 44-2, Rome depo at 71). Rome had maintained until the audio recordings were discovered and contradicted her story, that she told Mittelstaedt about the comment "monkey" reference in their February 2013 meeting and that he had said that "monkey" was not a racial slur. (*Id.*). Rome's own covert recording of this meeting confirms that she never complained during that meeting about specific racial slurs being used by anyone. And of course Mittelstaedt, who had always denied that he had condoned the term "monkey" as non-racial, was vindicated by the recording. Rome did state at the meeting that some of her coworkers had been critical of President Obama but she conceded during the conversation that the criticism was not necessarily race-based. In her deposition, with the recording now available to impeach her story, Rome claimed that Mittelstaedt must have made the "monkey" comment to her on the phone at some point.

When asked at her deposition whether she had ever heard racial slurs directed at African Americans at Children's she answered "yes," and said that coworker Gretchen Dondis called her a "nigger" once. (Rec. Doc. 44-2, Rome depo at 97). Rome couldn't remember what day it was, and she thought that another comment had been made but could not recall. Rome did not report this to anyone. Rome couldn't remember any other racial slurs being used. (*Id.* at 98). When pressed at her deposition about other racial conduct in the workplace, Rome said that Dorothy Phillips made derogatory comments

---

[11]  Rome clarified later in her deposition that it was Gretchen Dondis who called President Obama a monkey during a political conversation that she was having with someone else. (Rec. Doc. 44-2, Rome depo at 185-86).

about the way African Americans pronounce words and that she wished that the government would give drug tests to African Americans on food stamps. (*Id.* at 111). Rome did not report these incidents to anyone.

Rome identified other comments that she believed were racial in nature. For instance, Pam O'Flynn once referred to herself as "a redneck from the delta." (Rec. Doc. 44-2, Rome depo at 66). And once when Rome complained about Gretchen Dondis's rudeness, O'Flynn told her that Gretchen was an "uptown girl" and had been in pageants so Rome would just have "to deal with it." (*Id.*). These comments are not objectively racially hostile, regardless of how Rome perceived them.

The specific incidents of racially offensive comments are insufficient as a matter of law to support a Title VII hostile work environment claim. The comments directed at Rome were isolated incidents that were not sufficiently pervasive over the course of Rome's employment to alter the conditions of her employment. Most of the comments that Rome complains about, even if they were in fact made, while inappropriate and offensive, were not directed at her.

To be sure, the workplace at Children's was a "hostile" one in the medical secretaries group. The evidence of record demonstrates an environment rife with animosity, back-biting, and pettiness amongst the coworkers in that group. Rome's complaints to Mittelstaedt starting in February 2013 were based on that very complaint—that some people in the office, especially Gretchen Dondis, were rude and inconsiderate. The recording of the February 2013, meeting that later surfaced, and Rome's own notes taken after that meeting confirm that the hostilities in the office were not necessarily race-related. Rome even confirmed during her deposition the Gretchen and Dorothy were "hard to work with, that

they will force their way until they get what they want." (Rec. Doc. 44-2, Rome depo at 153-54). With respect to Dondis, Rome testified that she was verbally abusive to everybody at the office. (*Id.* at 161). Harassing incidents with no clear connection to race, no matter how offensive, are not probative of a *race-based* hostile work environment. *Hernandez*, 670 F.3d at 654. Title VII does not provide a cause of action for work environments that are simply "hostile."

Plaintiffs place much stock in Dr. Heinrich's testimony. Dr. Heinrich testified that he did believe that the environment at Children's was racially hostile toward African Americans even before Rome and Riley complained about it. (Rec. Doc. 59 Exh. 4A, Heinrich depo at 22, 47). But much of Dr. Heinrich's testimony was based on hearsay, and that is particularly true with respect to Rome and Riley. Dr. Heinrich did not personally witness any racial remarks directed at Rome and Riley that would add to what they reported themselves, and he only heard about Rome and Riley's complaints second-hand from them. (*Id.* at 34, 47). With respect to Dondis in particular, Dr. Heinrich testified that Dondis's behavior was not racist but that she was "very cutting with employees both white and black." (Rec. Doc. 59 Exh. 4A, Heinrich depo at 180). Dr. Heinrich's personal opinion that racial tensions existed amongst the medical secretaries might very well be a valid one. And perhaps Rome's own subjective belief that some seemingly race-neutral incidents were motivated by racial animus is correct. But these beliefs do not suffice to establish a claim under Title VII.

In sum, the acts of harassment alleged by Rome do not give rise to a hostile work environment claim, and she has not shown that any alleged acts affected a term, condition, or privilege of employment. Children's is entitled to judgment as a matter of law on Rome's hostile work environment claim.

### 3.    Intentional Infliction of Emotional Distress

Rome alleges that Children's is liable for intentional infliction of emotional distress for firing her. (Rec. Doc. 30, First Amend. Comp ¶ 18(d)). In order to recover for intentional infliction of emotional distress plaintiff must establish that the conduct of the defendant was extreme and outrageous, that the emotional distress suffered by the plaintiff was severe, and that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto*, 585 So. 2d 1205, 1209 (La. 1991). Rome's claim for intentional infliction of emotional distress fails as a matter of law on all elements. Rome presumably recognized as much because she did not attempt to defend this cause of action in her opposition. Children's is entitled to judgment as a matter of law on Rome's intentional infliction of emotional distress claim.

### 4.    Slander

Rome's slander claim is based on a letter that Mittelstaedt wrote to the Louisiana Workforce Commission on May 29, 2014, to protest payment of unemployment benefits to Rome. (Rec. Doc. 59 Exh. 49, Plaintiffs' Joint Opposition). In that letter Mittelstaedt states that Children's discharged Rome for *inter alia* "probable violation of Louisiana law." (*Id.*). In the detailed letter, Mittelstaedt states that "most [of the recordings found on Rome's computer] also violated Louisiana law, which states that bugging someone's office is illegal. Finally, Mittelstaedt concludes as follows:

> We are now in the process of preparing the evidence associated with this matter to turn over to the police for possible prosecution of Ms. Rome for violation of Louisiana law regarding her illegal recordings.
>
> We ask that you disqualify Ms. Rome from unemployment benefits and also assess penalties against her for gross misconduct.

(Rec. Doc. 59 Exh. 49, Plaintiffs' Joint Opposition).

Ms. Rome was denied unemployment benefits after her termination, presumably based upon Mittelstaedt's letter.

Defamation is a tort which involves the invasion of a person's interest in his or her reputation and good name. *Costello v. Hardy*, 864 So. 2d 129, 139 (La. 2004) (citing *Fitzgerald v. Tucker*, 737 So. 2d 706, 715 (La. 1999); *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997); *Sassone v. Elder*, 626 So. 2d 345, 350 (La. 1993)). Four elements are necessary to establish a defamation cause of action: 1) a false and defamatory statement concerning another; 2) an unprivileged communication to a third party; 3) fault (negligence or greater, such as malice) on the part of the publisher; and 4) resulting injury. *Id.* (quoting *Trentecosta*, 703 So. 2d at 559).

Words that convey an element of personal disgrace, dishonesty, or disrepute are defamatory. *Costello*, 864 So. 2d at 140 (citing *Fitzgerald*, 737 So. 2d at 716). In Louisiana, defamatory words have traditionally been classified into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning. *Id.* (citing *Lemeshewsky v. Dumaine*, 464 So. 2d 973, 975 (La. App. 4th Cir. 1985)). Words that expressly or implicitly accuse another of criminal conduct are considered defamatory per se. *Id.* When a plaintiff proves publication of words that are defamatory per se, the elements of falsity and malice (or fault) are presumed, but may be rebutted by the defendant. *Id.* (citing *Kosmitis v. Bailey*, 685 So. 2d 1177, 1180 (La. App. 2d Cir. 1996)).

Children's "words" were defamatory per se because Mittelstaedt accused Rome of criminal conduct. With the legal presumptions that attach to a defamatory per se statement, Rome satisfies elements 1, 3), and 4) of a defamation claim.

With respect to element 2) of a defamation claim, Children's submits that its statements to the Louisiana Workforce Commission are protected by a qualified privilege. Children's contends that Mittelstaedt's statements were made in good faith and that it concerned a matter of great concern to both Children's and the Louisiana Workforce Commission.

Liability for defamation does not attach from privileged publications or communication. *Hines v. Ark. La. Gas Co.*, 613 So. 2d 646, 656 (La. App. 2d Cir. 1993) (citing *Toomer v. Breaux*, 146 So. 2d 723 (La. App. 3d Cir. 1962)). With respect to an employer who undertakes an investigation of employee misconduct, a qualified or conditional privilege is enjoyed when making a statement in good faith, on a subject in which the communicator has an interest or duty, to one having a corresponding interest or duty. *Id.* (citing *Roberts v. La. Bank & Trust Co.*, 550 So. 2d 809 (La. App. 2d Cir. 1989)). "Good faith" means having reasonable grounds for believing that the statement is correct, but proof of ultimate truth is not necessarily required. *Id.*

The record in this case firmly supports a finding of good faith on Mittelstaedt's part for the statements that he made to the Louisiana Workforce Commission. Even if Mittelstaedt's statements regarding Rome's involvement in the non-consensual recordings were later determined to be inaccurate, it would not deprive the statements of their "good faith" character when he made them. Louisiana law prohibits the payment of unemployment benefits to an individual discharged for misconduct such as dishonesty or violation of the law. La. R.S. § 23:1601(2)(a). After Children's discovered the recordings that Rome had made in violation of hospital policy, it had conclusive proof of her dishonesty. Clearly, an employer such as Children's and the Louisiana Workforce Commission have a common

interest in ensuring that an individual terminated for misconduct that would statutorily disqualify her for benefits does not receive them. Therefore, even though Children's lacked direct proof of unlawful conduct, Children's was entitled to inform the Commission about its investigation and the conclusions that it reasonably and in good faith reached from it. The motion for summary judgment is GRANTED as to Rome's slander claim.

### Nicole Riley's Claims

#### 1.      Retaliatory Discharge

Children's fired Riley on May 26, 2014, which was shortly after Rome and Riley jointly filed the instant lawsuit on May 3, 2014. Riley moved to amend her complaint on February 2, 2015 to include *inter alia* a claim of retaliatory discharge. In her amended complaint, Riley avers that Children's terminated her in retaliation for "protected activities: filing prior EEOC charges and making verbal complaints of race discrimination to management . . . ." (Rec. Doc. 30, First Amend. Comp ¶ 18(a)). No other acts of retaliation are alleged. Children's contends that Riley was terminated for legitimate business reasons and that her complaints of racial discrimination played no part in the decision. Children's argues that Riley cannot establish but for causation or pretext under the applicable Title VII standards.

The legal standards that govern this claim are the same as those laid out in the section analyzing Rome's retaliatory discharge claim.

The first step in the analysis is Riley's prima facie case of retaliatory discharge. According to Riley, she initially raised claims of racial discrimination in October 2012. (Rec. Doc. 59, Riley oppo. at 12 & Exh. 25). Riley's own timeline reflects meetings with management as far back as October 2012 with the last meeting taking place in June 2013.

(*Id.* Exh. 25). Riley prepared this timeline less than a month before she was terminated. (*Id.*). At some point, Riley filed a charge of discrimination with the EEOC. Clearly Riley engaged in protected activity at various times.

Riley suffered an adverse employment action when she was terminated on May 26, 2014. Therefore, the first two steps in Riley's prima facie case for retaliatory discharge are satisfied.[12]

Next, Riley must establish a causal connection between the protected activity and her termination. Riley's entire causation analysis is premised on the theory of temporal proximity. Given that the filing of the federal lawsuit and the termination were unarguably "very close" in time, the Court finds that Riley has satisfied her prima facie case of retaliatory discharge.[13]

The next step of the *McDonnell Douglas* framework falls to Children's to produce its legitimate, non-discriminatory reason for terminating Riley. According to Mittelstaedt's letter, Riley was terminated because Mittelstaedt suspected her of being untruthful. (Rec. Doc. 45-4 Exh. E-2, Mittelstaedt letter). First, Mittelstaedt refers to the meeting that he had with Riley

---

[12]  Like Rome, the only claim for retaliation that Riley pleaded in her amended complaint was retaliatory discharge. Riley had been disciplined several times during her employment with Children's and it is clear from her deposition testimony that Riley's subjective belief is that all of the write-ups were motivated by race. But Riley makes no attempt to establish any other acts of discipline were adverse employment actions under Title VII.

[13]  To the extent, if any, that Riley relies on temporal proximity with respect to any other retaliatory act, her opposition is confusing on this point. Riley makes the following statement at page 13 of her opposition: "Close temporal proximity exists between [her] filing of the EEOC charge of discriminatory actions." The timing of acts is crucial to a temporal proximity argument yet Riley never expressly gives the date that she filed her EEOC charge and she never expressly links it to a specific retaliatory act. But again, given that the only retaliatory act pleaded was retaliatory discharge, see note 13 *supra*, the Court will only consider this act of alleged retaliation. As Riley points out, Children's challenge to her claim focuses on causation and pretext rather than on her prima facie case. (Rec. Doc. 59, Riley oppo. at 14).

on May 16, 2014, when he confronted her about the recordings found on Rome's computer. Riley had denied any knowledge of either the content of the recordings or the individual who made them. But the content of the recordings themselves suggested to Mittelstaedt that Riley had been involved. Second, there had been an issue with documents being missing from Riley's personnel file. According to the letter, Riley was given the file for review and it was later discovered that disciplinary warnings that should have been in the file were missing. When questioned, Riley denied that she reviewed the file. Mittelstaedt did not believe Riley and he was persuaded that Riley was being untruthful. (*Id.*).

Mittelstaedt's letter provides two non-discriminatory reasons for Children's decision to terminate Riley. The burden now shifts to Riley to prove that Children's' proffered reasons are a pretext for retaliation, or at least to create an issue of fact as to pretext. Riley must rebut each non-retaliatory reason articulated by Children's. To meet this burden Riley must show that Children's would not have fired her "but for" her having filed the instant lawsuit. The Court is persuaded that Riley has not created an issue of fact as to either pretext or but for causation.

Riley's argument in opposition, *i.e.*, that she continues to deny any involvement with the recordings and that truthfulness and credibility cannot be determined on summary judgment, misapprehends the parties' respective burdens of proof and the material issues in this Title VII case. Whether Riley was actually truthful or not about the recordings or her personnel file is not an issue that Children's has to prove. Children's does not have to prove that it terminated Riley for non-retaliatory reasons. Rather, Riley alone has the burden of proving that she was fired *because* she filed the instant law suit and/or an EEOC charge, and that in the absence of that protected activity, Children's would have continued with her

employment. Riley, like Rome, was an at-will employee who could be fired for *any* reason except one proscribed by Title VII. Therefore, even if Riley's credibility was tested at trial and a jury found her to be truthful on matters where Mittelstaedt found her untruthful, that would not mean that she was fired in retaliation for protected activity.[14]

That said, the Court has reviewed Riley's deposition testimony regarding the recordings made in the workplace, *recordings that she gave to the EEOC in support of her claims*. Children's did not have the benefit of Riley's implausible deposition testimony when it terminated her but it did have the Happy Audios recording found on Rome's computer. One of the recorded conversations takes place between Rome and Riley, and the there is a clear reference to "tapes" and that speaker appears to be Riley. There is also a suspicious statement regarding something being left on a coworker's desk and Children's concluded that it was Riley referring to a recording device. Children's' Material Facts 12 through 14 remain unrebutted and they fully support Children's legitimate reasons for terminating Riley. (Rec. Doc. 45-1). What Riley fails to comprehend is that even if proof of complete innocence were to somehow surface now after-the-fact, that does not impugn Children's' otherwise reasonable inferences from the evidence that it had when it terminated her and it does not *ipso facto* transform her discharge into a retaliatory one. Riley cannot demonstrate pretext and she cannot establish but for causation. Children's is entitled to judgment as a matter of law on Riley's retaliatory discharge claim.[15]

---

[14] When asked at her deposition why she believed that the hospital terminated her in retaliation for filing an EEOC charge, Riley responded, "Why would I be fired? No one gave me an explanation to why I was fired?" (Rec. Doc. 45-2, Riley depo at 155-56). Riley's subjective belief that she was worthy of continued employment with Children's is not probative of retaliation.

[15] When counsel for Children's was asking Riley general questions about private conversations in the workplace, Riley opined that workplace conversations behind closed doors would not be

2.      **Race Discrimination: Hostile Work Environment**

Children's moves for summary judgment on Riley's race-based hostile work environment claim. Children's points out that Riley's assertions of workplace incidents are vague, ambiguous, and generalized. Children's argues that the acts of harassment alleged by Riley do not give rise to a hostile work environment claim, and that she cannot prove that any alleged acts affected a term, condition, or privilege of employment.

The legal standards that govern this claim are the same as those laid out in the section analyzing Rome's hostile work environment claim.

Riley was questioned at her deposition as to specific incidents of racial animus in the workplace. Riley testified that Gretchen Dondis called her a "monkey." (Rec. Doc. 45-2, Riley depo at 85). Riley repeatedly testified that she did not know how many times this occurred, and that she only recalled the one time. (*Id.* at 91). She testified that Gretchen Dondis called Riley a "black bitch" once. (*Id.* at 90). On another occasion, Riley purportedly overheard part of a conversation where coworkers Gretchen Dondis, Dorothy Phillips, and Judy Gab referred to African-Americans as "monkeys." (*Id.* at 91).

Next, Riley testified that Dorothy Phillips had called her a "nigger." (*Id.* at 93). Riley could not recall anything about the incident or how often this had occurred. (*Id.* at 94). Riley testified that she had heard Dorothy Phillips say derogatory things about African-Americans in general, particularly after dealing with African-American patients. (*Id.* at 96).

These incidents are insufficient as a matter of law to support a Title VII hostile work

---

private ones like those held at home. (*Id.* at 194, 197). When counsel followed up with a question as to whether it would be inappropriate or wrong to record conversations of co-workers having lunch in an office, Riley retorted that having a private conversation in someone else's office would be wrong. (*Id.* at 198). When pressed for an answer to his question, Riley ultimately confirmed that it would be okay to record coworkers' conversations. (*Id.* at 200).

environment claim. The comments directed at Riley were isolated incidents that were not sufficiently pervasive over the course of Riley's employment to alter the conditions of her employment. Children's is entitled to judgment as a matter of law on Riley's hostile work environment claim.

### 3.     Intentional Infliction of Emotional Distress

Riley alleges that Children's is liable for intentional infliction of emotional distress for firing her. (Rec. Doc. 30, First Amend. Comp ¶ 18(d)). Riley's claim for intentional infliction of emotional distress fails as a matter of law on all elements. Riley presumably recognized as much because she did not attempt to defend this cause of action in her opposition. Children's is entitled to judgment as a matter of law on Riley's intentional infliction of emotional distress claim.

Accordingly;

**IT IS ORDERED** that the **Motion for Summary Judgment Regarding the Claims of Plaintiff Kelly Rome-Bienemy (Rec. Doc. 44)** filed by defendant Children's Hospital, Inc. is **GRANTED** in its entirety. All claims by plaintiff Kelly Rome-Bienemy are **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that the **Motion for Summary Judgment Regarding the Claims of Plaintiff Nicole Riley (Rec. Doc. 45)** filed by defendant Children's Hospital, Inc. is **GRANTED** in its entirety. All claims by plaintiff Nicole Riley are **DISMISSED** with prejudice;

**IT IS FURTHER ORDERED** that the **Motion in Limine to Exclude Expert Opinion (Rec. Doc. 43)** is **DENIED as moot**;

**IT IS FURTHER ORDERED** that the **Motion in Limine to Bar Illegal Audios (Rec.**

Doc. 55) is **DENIED as moot**;

      **IT IS FURTHER ORDERED** that the **Motion for Sanctions (Rec. Doc. 56)** is

**DENIED**;

      **IT IS FURTHER ORDERED** that the **Motions in Limine to Exclude Comparator**

**Evidence (Rec. Docs. 77 & 78)** are **DENIED as moot**.

      December 14, 2015

                        JAY C. ZAINEY
              UNITED STATES DISTRICT JUDGE